## THE SAM DEMAREST.

## WRIGHT & COBB LIGHTERAGE CO. v. PENNSYLVANIA R. CO.

### No. A–15861.

District Court, E. D. New York.

Dec. 30, 1940.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan and Charles F. Welch, both of New York City, of counsel), for libelant.

Burlingham, Veeder, Clark & Hupper, of New York City (Adrian J. O'Kane and John L. Belford, both of New York City, of counsel), for respondent.

BYERS, District Judge.

The libelant's barge Sam Demarest, while under the usual harbor charter to the respondent, which commenced on December 6, 1939, sustained hull damage for which recovery is herein sought. She was towed stern first by a Pennsylvania tug to the north side of Pennsylvania Pier L, Jersey City; she was moored about opposite door 24, near the center of this 1,400 foot pier. Ahead of the Demarest lay the libelant's barge Nana, close coupled.

This was accomplished at about 10:05 p.m. on December 6th.

There is a dispute as to whether the mooring was alongside the pier, as the tug captain asserts, or outside of a vessel already berthed at that place. The captain of the Demarest says there was a vessel inside his barge, the dimensions of which were not shown.

Since the slip is 340 feet wide, the width of open water on the port side of the Demarest was not lacking in significance, in view of later developments.

Around midnight the Demarest was struck by another vessel on her port side about amidship at her fourth plank from the bottom, about two feet above the water line. This damage also involved the wearing piece in the way of the broken plank; the break was up and down, the plank being stove in about an inch; from this it will be seen that the damage could have been done by a vessel moving in the slip.

The diesel tug Wicomico was in that slip around midnight to pick up the stick lighter France, approximately at door 31 on the same pier, which would be about 200 feet outriver from the place where the Sam Demarest lay.

The Wicomico entered the slip favoring the north side, not knowing the exact location of the France, which was picked up in the tug's searchlight; whereupon she circled around under a left rudder so as to head out of the slip, making fast to the France on the tug's starboard side.

Necessarily the maneuver required some backing and filling. Thus Sweeney, the tug's captain:

"I spotted my stick lighter, and I put my wheel hard aport, come around hard aport, came up toward the France, and backed on my boat—"

" * * * and then when I got up near the France I barely come up to it, and worked around on that boat.

" * * * * * *

"Q. You have to do considerable backing and filling in the case of such maneuvers, do you not? A. Not so much."

The Wicomico is 107 feet long; draws 13 feet, and has 700 horse power.

The only question in the case is whether the Wicomico actually did strike the Sam Demarest as the captain of the latter says, and the captain of the former denies.

If the striking did not take place, the libel must be dismissed, because the libelant has elected to establish the affirmative of that issue, and I am inclined to think that the reasonable probabilities of the case point to its success in the undertaking.

The conduct of Newman, the captain of the Demarest, was consistent with his belief that the Wicomico had done the damage, for while he did not see the striking, having then turned in for the night, immediately upon feeling the impact he got up, looked out of the window in his house, and saw such a tug, and he says that he discerned the name of her home port, "Cape Charles", even in the darkness, although he could not see her name, which was on the port side of the round of her stern.

He at once called the captain of the Nana, and they two inspected the hold of the Demarest and discovered the damage complained of.

Newman, having dressed, repaired promptly to the office of the night dispatcher on the pier, and told his story, which was later relayed to the captain of the tug; and the latter entered the slip at about 6:45 on the morning of December 7th, and sought out the Demarest and her captain, and they had an interview.

The tug captain says that at that time the Demarest was lying much closer to the bulkhead than has been stated thus far, and that her position at that time was about at door 13, which was inside the outboard end of float-bridge No. 5. Observing that to be the position of the Demarest, he asserted that his tug could not have struck the offending blow, because he could not

have turned his tug so as to do the damage where the barge then lay.

That was the reason that he gave for being convinced that there had been no collision between his tug and the Demarest.

Doubtless his opinion was honestly held, for he lost no time in making inquiry concerning the happening, but if he is mistaken as to the place where the Demarest lay at the time he picked up the France, and if she was then at about door 24, 200 feet or so inshore from the France, his tug might have done the damage although in his preoccupation he might not have been aware of it.

In any case, his asserted reason based upon the location of the Demarest as he described it at about 7 a.m. on December 7th, coupled with his statement that Newman, the master of the barge, told him that the Demarest was then lying where she had been all night, called for a more complete showing by the respondent than was made, touching the handling of the Demarest during the time that she lay in this slip.

The Harrisburg brought her in, and her captain says he berthed her as has been stated. If Sweeney, also a respondent's witness, is right as to her position nine hours later, it follows that she must have been moved a distance inshore of about eleven doors, or nearly 400 feet.

Waelde, of the respondent's shifting tug Columbus, put the Demarest and the Nana inshore from door 19 at about 12:50 a.m. on December 7th, and at about door 13 at 5:45 a.m.

These various observations are not destroyed by Sweeney's version of what Newman said about not having been moved all night, because he had turned in and may be a heavy sleeper.

No movement of the Demarest inshore from her 10:05 p.m. berth has been shown prior to 12 o'clock midnight when Sweeney came in with the Wicomico to take the France in tow, and since his only reason for denying that his tug struck the Demarest is her position seven hours later, which her captain said was that of her original berth, his denial of the striking becomes a mere opinion, the basis of which is destroyed by other testimony adduced by the respondent, and cannot prevail against Newman's positive testimony that the damage was done by the Wicomico.

True, the identification of the tug was not complete, nor was Newman's observation of her position, when he says he saw her stern in contact with his port side, very convincing; but she has been shown to have been maneuvering in the slip at the time, and to have been in a position to strike the Demarest, and it is more than likely that she did.

Had the respondent seen fit to call witnesses from the Northern Contracting Company, its stevedore, it is a fair inference that they would have corroborated its own tug captains concerning the various berths occupied by the Demarest during the hours that she was under respondent's control. At least, that they would not have contradicted the master of the Harrisburg that she was landed by door 24, about 200 feet inshore from the place whence the France was taken in tow by the Wicomico.

The respondent has not convincingly gone forward with evidence sufficiently to explain away the libelant's prima facie case. The latter may have the usual decree, with costs. If more itemized findings are desired, they may be settled with the decree.